IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 21, 2015 Session

**IN RE GAVIN G.**

**Appeal from the Chancery Court for Maury County**
**No. A-028-13     Stella L. Hargrove, Chancellor**

_____

**No. M2014-01657-COA-R3-PT – Filed June 23, 2015**

_____

This appeal arises from the termination of Father's parental rights.  After Father had not seen the child for over a year-and-a-half, Mother and her husband petitioned to terminate Father's parental rights.  Following a trial, the chancery court found that Father had abandoned the child by willfully failing to visit him.  The court also found that the termination of Father's parental rights was in the child's best interest.  Father appeals the court's determination that he abandoned the child and that the termination of his rights was in the child's best interest.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Cara E. Lynn, Columbia, Tennessee, for the appellant, Adam G.

S. Jason Whatley, Columbia, Tennessee, for the appellees, Rex B. and Amy B.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Gavin G. was born out-of-wedlock in May 2009 to Amy B. ("Mother") and Adam G. ("Father").  Mother and Father lived together during Mother's pregnancy and after Gavin's birth until July 2009, when they ended their relationship.  After the parties separated, Father's mother ("Grandmother") watched Gavin during the day while Mother worked.  This arrangement continued from July 2009 to May 2010.  Father lived with

Grandmother during that time, so he saw Gavin most weekdays "if he would make it home before [Mother] would [pick up] Gavin."

In late 2009, when Gavin was about six months old, Mother began a relationship with Rex B. ("Stepfather"). Mother and Gavin began living with Stepfather in spring 2010. Shortly thereafter, Mother enrolled Gavin in daycare, obviating the need for Grandmother to watch the child during the day.

In August 2010, Father petitioned to establish parentage and set visitation. The parties entered into an agreed parenting plan. The plan named Mother as the primary residential parent and gave her 285 days of parenting time. The plan granted Father visitation with Gavin on some holidays and every other weekend, for a total of 80 days per year. Father could only exercise his parenting time under Grandmother's supervision.

Father regularly visited Gavin and spent almost every other weekend with him from August 2010 to December 2011. Father's visitations with Gavin occurred primarily at Grandmother's home. Mother claims Father's last visit with Gavin was on December 24, 2011. Although Father claimed he had visited Gavin since then, he could not recall any particular dates and admitted that if any visits occurred, they were "rare and sporadic."

Father admitted that from December 2011 to December 2012, his addiction to Xanax was "real bad." Father also had legal troubles. Although he was arrested several times for driving with a suspended or revoked license, the charges were dismissed. He was convicted of felony theft in May 2012 and served two months in prison.

In December 2012, Father completed a seven-day detox program and spent thirty days at a treatment facility. In January 2013, he enrolled in a sober living facility. While living at the facility, Father took the time to personally file a motion to lower his child support obligation in May 2013. Father stated that he needed a reduction in child support because: "Changed jobs and financial strain at new job. Moved cities and paying higher rent. New job pays less. Lost previous job, could not find work in Columbia, and had to move to Murfreesboro." Father continued to live at the facility until November 2013. After leaving the facility, Father moved into his own apartment.

Before Father entered detox, Mother and Stepfather married in October 2012. On August 30, 2013, Mother and Stepfather petitioned to terminate Father's parental rights. As grounds, Mother and Stepfather, who intended to adopt Gavin,[1] alleged that Father had abandoned the child by both failing to support and visit him.

---

[1] Under Tennessee Code Annotated § 36-1-113(b)(1) (2014), Mother would not have standing to seek the termination of Father's parental rights unless he "has been found to have committed severe child sexual abuse under any prior order of a criminal court," as defined by Tennessee Code Annotated § 36-1-

## A. PROOF AT TRIAL

The chancery court conducted a trial on Mother and Stepfather's petition on July 15, 2014. Mother, Stepfather, Father, Grandmother, and a local police officer testified. The parties stipulated to the testimony of Mother's parents and sister, Stepfather's mother, and one of Gavin's teachers, specifically that they would testify to Mother's and Stepfather's loving, strong relationship with Gavin and that Gavin was thriving in their care.

Mother testified that she and Father were completely unable to communicate. She stated that they had almost never had a "normal conversation"—most of their previous conversations had involved Father "cursing, yelling, et cetera." Since they ended their relationship, Mother and Father communicated almost exclusively through Grandmother.

Mother maintained that Grandmother arranged her own visits with Gavin. According to Mother, Grandmother never attempted to arrange visits for Father, except for one request to take Gavin to Father's rehabilitation facility in summer 2013. Mother testified that she would not allow Gavin to visit Father at the rehabilitation facility. She explained that she did not think the facility was "a place where a child should be." Moreover, she stated that, "[Gavin] did not have a relationship with his father. I think that would be very, very awkward for the child."

Mother stated that Gavin refers to Father as "his other daddy." She felt that the termination of Father's parental rights was in Gavin's best interest because Stepfather was "such a wonderful father to [Gavin] that he deserves it," and Gavin "deserve[d] the best father that he can have." When asked if she could see "any way possible . . . that Gavin could have you and your husband . . . and have his father in his life?" Mother responded:

> We definitely could make it work, but I do think it would be very difficult with no communication. Of course, we are a lot older than we once were, but I just don't think with no communication there would ever be a good plan. [Gavin] has a great life the way he is, and I don't want him to not have the father he's supposed to have, but I just don't see communication ever working out in that aspect.

Stepfather testified that he viewed Gavin "like he's [his] own." He stated that he was "100 percent" prepared to adopt Gavin if Father's parental rights were terminated. Stepfather stated that he was involved in Gavin's day-to-day care and extracurricular sporting activities. When he was asked whether he saw "any way in Gavin's best

113(g)(11). However, she must join in the petition to show her consent to the adoption. Tenn. Code Ann. § 36-1-115(c) (2014).

interest . . . that he could have you and your wife and his father in his life?" he responded, "Sure," but that "things would have to change." Specifically, Stepfather stated that there would have to be "proof that [Father] wants to be a dad" in order for Father to become involved in Gavin's life.

Father admitted that he was previously addicted to Xanax from summer 2010 to December 2012. Although he had a prescription for Xanax, he admitted he purchased or otherwise obtained additional Xanax pills illegally. He attributed his sporadic visitation with Gavin, in part, to his prior drug addiction. However, Father testified that he has been sober and off drugs since December 6, 2012. Father also tested negative for drug use at the hearing.

Regarding visitation with Gavin while he was residing at the sober living facility, Father testified that his ability to visit was limited. He was not allowed to have outside visitors at the facility until after he had lived there for thirty days. During his first thirty days at the facility, Father could not use the internet or phone, and he could not receive visitors or visit others. After he completed the first thirty days, Father communicated with Grandmother via written letters and "weekly" phone calls. After six months at the facility, Father was allowed to submit requests to visit others. Father requested and received permission to visit Grandmother at least two times while he was living at the facility. Father also requested and received permission to visit the Maury County Courthouse to file a motion to reduce his child support obligation in May 2013.

Father claimed his limited opportunities for visitation with Gavin were impeded because Mother would not allow Gavin to visit Father at the facility or at Grandmother's home. Father also claims he could only request visitation with Gavin through Grandmother because he and Mother were unable to communicate. Yet, he agreed that his attempts to arrange visitation through Grandmother were not all he could have done. Father admitted that he could have called Mother directly to arrange visitation, but he had not done so. Although the facility had telephones and Father had a cell phone, he stated his only attempt to arrange visitation with Gavin was through Grandmother.

Father also never called Gavin or sent him letters or cards while he was living at the facility. Despite their lack of contact, Father said that, when he was visiting with Gavin, their relationship was "great. It was good. We played X-Box all the time." When asked if he saw "any way that it could be in Gavin's best interest to have all three of you in his life, [Mother] and [Stepfather] and you," he responded "yes." He "absolutely" thought the three of them could communicate and coordinate visitation arrangements and that he could "communicate with them in a positive way."

Grandmother testified that, on one occasion in 2013, she asked Mother to allow her to take Gavin to visit Father at the facility. She testified that on another occasion, she suggested reconnecting Gavin and Father at her home while Father was on "weekend

passes" from the facility. When Mother did not agree to visitation at Grandmother's home, Grandmother stated that she "backed off," implying that she did not make any more requests for Father's visitation with Gavin. When asked why Father did not do more to attempt to visit Gavin, Grandmother stated that he was "ashamed." Grandmother did not believe Mother and Father "could communicate directly in a positive way about Gavin" unless "[Mother] can forgive [Father] . . . ."

## B. ORDER TERMINATING PARENTAL RIGHTS

In an order entered July 25, 2014, the court granted the petition to terminate Father's parental rights. Regarding the statutory grounds for termination of Father's rights, the court found that Mother and Stepfather had "failed to carry their burden of proof by clear and convincing evidence as to the statutory ground of abandonment by willful failure to provide support." However, regarding the ground of abandonment by willful failure to visit, the court found:

> Two issues are not disputed: (1) Again, by his own admission any visitation that might have taken place between [Father] and Gavin since December 24, 2011, has been rare and sporadic, and token visitation at best; and (2) [Father] was in Murfreesboro in a half-way house during the four (4) months preceding the filing of the Petition, and did not visit with Gavin. The Court must address whether the failure to visit was willful. . . . .

> The Court does not find [Father] to be a credible witness. He says what he thinks will please the Court. Furthermore, the Court finds that [Father] is a big baby, who sought sympathy during rehabilitation and received same from his mother. He expected his mother to insist that Gavin be brought to him at the half-way house when he had made absolutely no effort to have a relationship with his son. They played x-box. Other than perhaps bathing Gavin, [Father] failed to give the Court any example of ever taking day-to-day responsibility for his son. . . . .

> . . . . [Father] expressed no emotion one way or another. The Court is concerned that it is really [Grandmother] who is striving to have a relationship with Gavin. . . . .

> The Court finds that (1) [Father] was aware of his right, as well as his duty, to visit his child and maintain a relationship with him; and (2) that he had the capacity to do so, made no attempt to do so, and has no justifiable excuse for not doing so.

The court also found by "clear and convincing evidence that termination is in the best interest of the child . . . ." With regard to seven statutory factors, the court stated:

> Each of the factors weighs strongly against [Father]. [Father] has not maintained regular visitation or other contact with Gavin since he was two (2) years old; no relationship has been established between Gavin and [Father] beyond age two (2); [Father] has not consistently paid child support for Gavin even though court ordered to do so. . . . [N]o child support was paid for up to one and one-half years at one time. [Father] has refused to even attempt to make an adjustment of circumstances, conduct, or conditions as to make it safe and in Gavin's best interest to be in his home. He did enter treatment and rehabilitation. During this time he expected his mother to bring Gavin to him. He took no action himself to see his son upon his passes to come to Columbia; after rehabilitation [Father] moved out of his mother's home for some time and lived with a female with a drug addiction; he testified that he now lives in Murfreesboro; however, the Court heard no testimony that [Father] has attempted to establish a meaningful relationship between himself and Gavin; [Father] has never demonstrated that he wants to provide a physical environment that is healthy and safe for Gavin. Indeed, he has always relied on his mother to do this for him. The Court finds that [Father] prefers to be free of any day-to-day responsibility for Gavin. He wants all the rights, but none of the responsibilities. The Court is very concerned about the adverse effect a change of caretakers and physical environment is likely to have on Gavin, both emotionally and psychologically.

Father timely appealed the trial court's judgment.

## II. ANALYSIS

Father raises two issues on appeal: (1) whether the trial court erred in finding that his failure to visit was willful, and thus constituted abandonment under Tennessee Code Annotated § 36-1-102(1)(A) (2014); and (2) whether the trial court erred in finding by clear and convincing evidence that the termination of his parental rights was in the child's best interest.

### A. STANDARD OF REVIEW

Termination of parental rights is one of the most serious decisions courts make. *Santosky v. Kramer*, 455 U.S. 745, 787 (1982) ("Few consequences of judicial action are so grave as the severance of natural family ties."). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing

forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1).

A parent has a fundamental right, based in both the federal and State constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). Although this right is fundamental, it is not absolute. The state may interfere with parental rights through judicial action in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence that at least one of the statutory grounds for termination exists and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *see Santosky*, 455 U.S. at 769, and its purpose "is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see also In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622. "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The party seeking termination has the burden of proof. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

On appeal, we review the trial court's findings of fact in termination proceedings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Next, "[i]n light of the heightened burden of proof in [termination] proceedings . . . [we] must then make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo without any presumption of correctness. *In re J.C.D.*, 254

S.W.3d 432, 439 (Tenn. Ct. App. 2007) (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993)).

We note that the trial court specifically found Father not to be a credible witness. As our Supreme Court has observed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary.

*Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011) (citations omitted).

## B. STATUTORY GROUND FOR TERMINATION

Turning to Father's issues, we first consider whether the trial court erred in terminating Father's parental rights to Gavin pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and -102(1)(A)(i) (2010) for abandonment by willful failure to visit.

"Abandonment is defined as the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). In this case, the relevant four-month period was May 29, 2013, to August 29, 2013. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (holding that the last day of the four month period is the day before the petition is filed).

Petitioners carry the burden to demonstrate by clear and convincing evidence that a parent abandoned his child by willfully failing to visit him. *See In re Audrey S.*, 182 S.W.3d at 864. Whether a parent failed to visit is a question of fact, which we presume to be correct unless the evidence preponderates otherwise. *In re Adoption of Angela E.*, 402 S.W.3d at 640. However, whether a parent's failure to visit was willful is a question of law, which we review de novo with no presumption of correctness. *Id.*

In the context of termination of parental rights actions, "'willfulness' does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. Willfulness is also not determined by the party's ill will or malevolence. *Id.* Instead, conduct is willful if it is intentional or voluntary, rather than

coerced, accidental, or inadvertent. *Id.* In other words, a person acts willfully "if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 864. Willfulness is also determined by the party's intent, which triers of fact may infer from circumstantial evidence like the party's actions or conduct. *Id.*

Failure to visit a child is willful when a parent is aware of his duty to visit, "has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* A failure to visit cannot be excused by another person's conduct "unless the conduct actually prevents the person with the obligation from performing [his duty] . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.* (citations omitted).

Father does not dispute that he failed to visit Gavin during the relevant four-month period. He argues instead that his actions were not willful because he was in a sober living facility during the entire four-month period. As a result, Father claims he was unable to visit Gavin. According to Father, the facility's "specific rules" limited Father to on-site visits with family or occasional day passes to visit a specific location. Father claims Mother refused to allow Gavin to come to the facility or to Grandmother's home.

Despite Mother's resistance to visitation at the facility or Grandmother's home, we conclude Father's failure to visit was willful. Father was aware of his obligation to visit Gavin. In fact, he petitioned to set visitation in August 2010. He also had the capacity to do so. Although he lived in the sober living facility, the proof showed Father was able to arrange visits and contact with individuals outside the facility. Father was also able to call, write, and visit Grandmother. He did not do the same for Gavin.

Although the facility limited Father's options for visiting Gavin, we conclude Father had no justifiable excuse for his failure to visit Gavin. Father had the ability to request passes to visit others, and he was able to request visitation with Gavin through Mother or the court. Father did neither. Father claims Mother impeded his ability to visit Gavin. Although Mother limited the locations in which Father could visit Gavin, she did not significantly restrain or interfere with Father's ability to develop a relationship with Gavin. Even Father admits that he could have done more to arrange visitation with Gavin than make requests through Grandmother. Despite the parties' communication difficulties, Father had a legal obligation to visit his son, and he completely failed to do so during the relevant four-month period. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at \*23 (Tenn. Ct. App. May 4, 2005) (finding that a mother had abandoned her children for willful failure to visit despite her attempts to arrange visitation through third parties before the relevant four-month period).

Perhaps most telling, in May 2013, Father left the facility to personally file a motion to reduce his child support obligation. Yet, despite his alleged difficulties communicating with Mother, he did not file a motion requesting visitation with Gavin.

- 9 -

Certainly, Father was under no requirement to seek court assistance to enforce his visitation rights. *See In re Joseph D.N.*, No. M2009-01353-COA-R3-PT, 2010 WL 744415, at *4 (Tenn. Ct. App. Mar. 3, 2010). However, taking legal action to enforce visitation rights can preclude a finding of willfulness. *In re M.L.P.*, No. W2007-01278-COA-R3-PT, 2008 WL 933086, at *11 (Tenn. Ct. App. Apr. 8, 2008); *see also In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (finding that the parents had not abandoned their child, despite their failure to visit, because they "actively pursued legal proceedings to regain custody."). If Father wanted to visit Gavin but was unreasonably being denied this opportunity, he could have filed a motion to enforce his right to visit. He chose to seek only a reduction in his support obligation instead.

Therefore, we conclude that there is clear and convincing evidence that Father abandoned Gavin by willfully failing to visit him for the four months preceding the filing of the petition.

## C.  BEST INTEREST OF THE CHILD

The focus of the best interest analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). However, when the interests of the parent and child conflict, we resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d) (2014).

Under Tennessee Code Annotated § 36-1-113(i), courts consider nine factors in making a best interest determination:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substance as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department . . . .

Tenn. Code Ann. § 36-1-113(i).  The statutory best interest factors are neither exhaustive nor are they applicable in every case.  *See In re William T.H.*, No. M2013-00448-COA-R3-PT, 2014 WL 644730, at *4 (Tenn. Ct. App. Feb. 18, 2014).  In this case, factors two and six are not applicable.

The trial court found that all the applicable factors weighed against Father.  Father claims that the evidence preponderates against the trial court's factual findings on the best interest factors.  Factor (1) concerns adjustments made by the parent in order to make it safe for the child to return to the parent's home.  Father claims that, by entering the rehabilitation facility, remaining drug-free, and maintaining housing and employment, he adjusted his circumstances.  We acknowledge that much of Father's testimony supports these assertions.  However, the trial court specifically found Father not to be a credible witness.  The trial court stated, "[Father] says what he thinks will please the Court."  We rely on the trial court's credibility determination because there is not clear and convincing evidence to overturn it.

Even if Father has addressed his drug addiction, he has failed to adjust his conduct as a parent.  He failed to visit Gavin over the past three and one-half years.  Even after Father went into recovery and was living in a sober living facility, he failed to request visitation with Gavin, call, or even write him.  During the same period, Father was able to visit, call, and write to Grandmother and visit the court to file a motion to reduce his child

- 11 -

support obligation. For nine months preceding the filing of the petition, Father was apparently not abusing drugs and still did not initiate any contact with Gavin.

While we commend Father for addressing his substance abuse and dealing with his criminal issues, we cannot ignore Father's lack of progress in becoming an engaged parent. Father failed to visit Gavin over the past three and one-half years. As a result, Father has been almost completely absent for the majority of Gavin's young life. There is no indication from Father's past that he either desired or was able to care for and supervise Gavin. At trial, Father stated that he was now ready and able to become involved in Gavin's care and supervision, but the trial court did not find Father to be credible. Moreover, Mother, Stepfather, and even Grandmother thought Father's communication regarding Gavin was unlikely to change in the future, for a variety of reasons.

Factor (3) concerns contact with the child. Father claims that he has not maintained consistent visitation with Gavin because he was prevented from doing so. He argues that he was living in a rehabilitation facility during the four months preceding the filing of the petition and his visitation options were limited. Father argues he could have only visited Gavin at the facility or at Grandmother's home under her supervision. Mother would not allow visitation at the facility or at Grandmother's home. However, Father had at least two other avenues for pursuing visitation with Gavin. As he admitted, he could have directly contacted Mother to arrange visitation. He also could have petitioned the court to order visitation when he filed a pro se motion to reduce his child support obligation. Father attempted neither.

Under factor (4), the court examines the nature of the relationship between the parent and child. Father maintains that he has a meaningful relationship with Gavin, and that he and his family formed a strong bond with Gavin. He also claimed to be responsible for Gavin's care when he exercised visitation. However, when asked which specific activities he and Gavin did together, Father mentioned only bathing Gavin and playing video games. Mother testified that Gavin is confused by Father and refers to him as his "other Daddy." Father may still have an emotional bond with Gavin. However, it is doubtful Gavin has maintained an emotional bond with Father given his extended absence from Gavin's life. Although the record indicates that Gavin knows who Father is, Gavin, now six, has had no contact with Father for three and one-half years. Mother testified that Gavin had no relationship with Father.

Factor (5) concerns the effect a change of caretakers and environment will have on the child's emotional, psychological, or medical condition. Father claims there was no evidence at trial regarding the effect a change of caretakers and physical environment is likely to have on Gavin. With regard to this factor, the trial court stated, "[t]he Court is very concerned about the adverse effect a change of caretakers and physical environment is likely to have on Gavin, both emotionally and psychologically." This statement is not

a factual finding. Rather, it is a statement of concern. While we can speculate that introducing Father as a new caretaker would be disruptive to Gavin's emotional, psychological, and mental health, the record is devoid of evidence on this factor. Therefore, we do not find it appropriate to consider this factor.

The parent's home environment is the focus of factor (7). The court found that the physical environment of Father's home weighed against him. Father maintains that there is no condition in his home that would render him unable to care for Gavin in a safe and stable manner. Father testified that he lived by himself in an apartment. Other than where Father lived at the time of trial, scant evidence was offered regarding whether Father's home was healthy and safe for Gavin. Father admitted that he lived with another recovering drug addict for three to four months following his departure from the sober living facility, but he claimed they were no longer in a relationship. In light of this evidence, we cannot conclude that the evidence preponderates against the trial court's findings regarding factor (7).

As for factor (8), the trial court called into question Father's emotional maturity. The trial court also expressed concern about Father's role in caring for Gavin when they did have contact, noting Father "has always relied on his mother" for Gavin's needs. Father argues he has adequately addressed his drug and criminal issues and is now able to safely supervise Gavin. We do not find that the evidence preponderates against the trial court's findings relative to this factor.

Finally, factor (9) examines the payment of child support. Father maintains that he consistently paid child support when he was able to do so. However, Father failed to pay any child support during several time periods. Father failed to pay child support from December 2010 to May 2011; August 2011 to March 2013 (over a year and one-half); and September 2013 to March 2014. During some of the periods in 2011 and 2012, Father acknowledged that he was working and buying drugs. When he was not paying support, Father had a continuing obligation under a child support order, which had not been modified by the court. *See Mowery v. Mowery*, 363 S.W.2d 405, 407 (Tenn. Ct. App. 1962) (finding a Father who was unable to pay child support guilty of contempt because he failed to apply for a reduction and disregarded the order of the Court). If he was unable to pay child support, he had the responsibility to petition the court, as he did in May 2013, to reduce his obligation.

The goals of any termination proceeding are to help a child achieve permanency, stability, and safety. *See, e.g.*, *In re T.M.G.*, 283 S.W.3d 318, 322-23 (Tenn. Ct. App. 2008). Sometimes, the child's best interest may need to be considered by weighing the losses and benefits that will accrue to a child from the termination of a parent's rights:

> Since the court is required to focus on what is best for the child, rather than
> to act out of sympathy for the parent, the court often has to determine if the

- 13 -

strength of the emotional bond that exists between the parent and the child is more significant than the benefit the child will receive from termination, which is intended to free the child for adoption and a permanent, stable home.

*In re Dominique L.H.*, 393 S.W.3d 710, 718-19 (Tenn. Ct. App. 2012) (quoting Sherry S. Zimmerman, Annotation, *Parents' Mental Illness or Mental Deficiency as Ground for Termination of Parental Rights—Best Interests Analysis*, 117 A.L.R. 5th 349 (2004)).

When we consider the loss of the emotional bond Gavin will experience if Father's rights are terminated against the benefit he will receive from termination, we must conclude that the benefits of termination are entitled to more weight. During his young life, Gavin has had very little contact with Father. We assume Gavin's positive environment living with Mother and Stepfather would not change if Father's rights were not terminated. *See In re William T.H.*, 2014 WL 644730, at \*5 (declining to terminate a father's parental rights where Father was financially supporting the child and his visits had been restricted by Mother). However, if Father's rights are terminated, Gavin will be available for adoption and will have permanency in the stable home he shares with Mother and Stepfather. *See In re Adoption of T.L.H.*, No. M2009-01011-COA-R3-PT, 2009 WL 4113706, at \*2-3 (Tenn. Ct. App. Nov. 24, 2009) (finding that termination was in a child's best interest when a "Father allowed his relationship with his child to become non-existent and the stepfather stepped into [the] void.").

When we consider the lack of relationship between Father and Gavin, Father's consistent failure to visit and support, and the likelihood that these circumstances will not change, we conclude that there is clear and convincing evidence that the termination of Father's parental rights is in Gavin's best interest.

### III. CONCLUSION

Because we conclude that Father abandoned Gavin by willful failure to visit and that the termination of Father's parental rights is in Gavin's best interest, we affirm the trial court's judgment.

_____
W. NEAL McBRAYER, JUDGE